**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION**

JUANTRELL HARRIS                                                     PLAINTIFF

V.                          NO. 2:08CV00044 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                          DEFENDANT

**MEMORANDUM AND ORDER**

**I. Introduction**

Plaintiff, Juantrell Harris, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (docket entries #11 and #12), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108, F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On June 1, 2004, Plaintiff filed an Application for Supplemental Security Income ("SSI") (Tr. 54-55), alleging disability since January 1, 1992, due to a mental limitation and a mental disorder.[2] (Tr. 60.) After Plaintiff's claim was denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge ("ALJ").

On August 16, 2006, the ALJ conducted an administrative hearing. (Tr. 144-70.) At the time of this hearing, Plaintiff was 26 years old. He dropped out in the 9th or 10th grade of high school and appears to have been assigned to special education classes throughout his formal education. (Tr. 157, 160.) Plaintiff testified that he had no past relevant work.[3] (Tr. 153-55.)

On November 21, 2006, the ALJ issued a decision denying Plaintiff's claim for SSI benefits. (Tr. 13-19.) After that decision was affirmed by the Appeals Council (Tr. 4-6), it became the final

---

[2]Plaintiff was born on June 17, 1980. (Tr. 150.) In 1991, when Plaintiff was eleven years old, he was found to be disabled and received SSI benefits through September of 1997. In 1997, when Plaintiff turned eighteen, his disability status was reevaluated on continuing disability review and he was determined to be no longer disabled as of July 2, 1997.

Plaintiff challenged the cessation of his benefits, and, on January 14, 1999, an ALJ affirmed the denial of benefits. Plaintiff appealed, and, on August 1, 2000, the Appeals Council affirmed; thereby making the ALJ's decision the final decision of the Commissioner. It does not appear that Plaintiff appealed. Thus, the ALJ's January 14, 1999 decision is now entitled to administrative finality.

[3]According to Plaintiff, he tried to work on a farm but wrecked a tractor during the first week and was terminated. He also tried assembly line work for a short period of time but continually dropped things and was terminated. (Tr. 153-154.)

decision of the Commissioner. Plaintiff then filed his Complaint (docket entry #2) appealing that decision to this Court.

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(I) (2005). If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.* at § 416.920(b).

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment. *Id.*, § 416.920(a)(4)(ii). If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 416.920(a)(4)(iii).[4] If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient residual functional capacity, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 416.920(a)(4)(iv). If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 416.920(a)(4)(v). If so, benefits are denied; if not, benefits are awarded. *Id.*

In his November 21, 2006 decision, the ALJ found that Plaintiff: (1) had not engaged in

---

[4] If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence. *Id.*, § 404.1520(e). This RFC is then used by the ALJ in his analysis at Steps 4 or 5. *Id.*

substantial gainful activity since June 1, 2004, the date he filed his application for SSI; (2) had severe impairments consisting of "borderline intellectual functioning"[5] and narcissistic and explosive personality disorder; (3) did not have any impairment or combination of impairments that met or equaled a Listing; (4) was not fully credible; (5) had the RFC for a range of unskilled work, as described in hypothetical question "2.5" to the vocational expert; (6) had no past relevant work; and (7) given his age (26), level of education (10th grade), work skills, and RFC, he was capable of making an adjustment to other work and jobs which existed in significant numbers and which could be performed at the medium and light levels, including jobs as a janitor/building cleaner. [6] Thus, the ALJ concluded that Plaintiff was not disabled. (Tr. 17-18.)

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #11), he argues that the ALJ erred: (1) because substantial evidence does not support his findings that Plaintiff failed to meet Listing 12.05C;[7] (2) in making his Step 5 determination that Plaintiff could perform other work; and (3) in evaluating Plaintiff's credibility. After carefully reviewing the record, the Court concludes that substantial

---

[5]Borderline intellectual functioning is defined as an IQ in the 71-84 range. DSM-IV at 740.

[6]At Step 5, the ALJ relied on the testimony of a vocational expert.

[7]Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. A claimant is considered mentally retarded if he meets one of four sets of criteria under Listing 12.05, one of which is "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. (2006). The Eighth Circuit has characterized the three requirements of Listing 12.05C as follows: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).

evidence does not support the ALJ's finding that Plaintiff had "borderline intellectual functioning," *i.e.* his IQ was above 70. Thus, the ALJ erred in making that important determination and in the limitations he included in the hypothetical questions he asked the vocational expert at Step 5 of his analysis.

A.   **Medical Evidence Relevant to the Determination of Plaintiff's IQ**

On January 16, 2002, Plaintiff was seen by Dr. Sean Buckley, a psychiatrist with Counseling Services of Eastern Arkansas. (Tr. 136-137.) In his "Medical Evaluation Notes," Dr. Buckley observed that Plaintiff: (1) had poor concentration during the interview and also likely "has a very low IQ"; (2) left school in the 9th grade and has been unable to keep a job; and (3) was "pleasant and cooperative" during the interview. Although Dr. Buckley did not administer an IQ test, he concluded, based on his evaluation, that Plaintiff's IQ placed him in the range of "mild mental retardation." *Id.* According to DSM IV, "mild mental retardation" describes an IQ range from "50-55 to 70."

On January 28, 2002, Plaintiff was seen by a Licensed Social Worker at Counseling Service of Eastern Arkansas. She observed that Plaintiff presented with poor hygiene and slight body odor. The primary issue addressed was Plaintiff's depression. He was assigned a GAF of 50. (Tr. 135.)

On August 5, 2002, Plaintiff was seen by Dr. David Erby, another staff psychiatrist with Counseling Services of Eastern Arkansas. (Tr. 133-134.) He diagnosed Plaintiff with "Depressive Disorder, NOS" and assigned him a GAF of 50. *Id.*

On August 5, 2004, Dr. Nancy Toombs, a licensed psychologist, performed a "Mental Status Evaluation" of Plaintiff and administered the WAIS-III IQ test. (Tr. 85-89.) Plaintiff told Dr. Toombs he had tried working on a farm but was terminated after a short time because he constantly

tore up farm equipment, which he "didn't know how to use . . . ." He also related having a factory job for a short while, but he "kept dropping things and they didn't want to work with me no more." (Tr. 85.) In describing Plaintiff's progress in school, Dr. Toombs stated the following: "The claimant went to the ninth grade in school, he was in alternative school. It is unclear whether or not he dropped out. His ability to read and write is poor." (Tr. 86.)

Dr. Toombs described Plaintiff's use of language and grammar as poor and his stream of mental activity to be "poorly organized." Although Dr. Toombs administered the WAIS-III IQ test, she described Plaintiff as putting forth "very poor effort," which rendered his test scores invalid. Those invalid test scores were as follows: Verbal IQ 58; Performance IQ 59; Full Scale IV 54. Based on his verbal responses to a series of questions she asked him, Dr. Toombs concluded that, while his full scale IQ of 54 is a "gross under estimate of his abilities," she estimated his *valid IQ* to be "well into the mid to high 60s." Her Axis II diagnostic impression was "borderline intellectual functioning versus mild mental retardation." (Tr. 89.)

Finally, on June 22, 2006, Dr. June A. Powell, another staff psychiatrist at Counseling Services of Eastern Arkansas, performed a psychiatric evaluation of Plaintiff. Importantly, Dr. Powell did *not* administer an IQ test or even ask Plaintiff any questions aimed at estimating his IQ. She noted that he went through the 9th or 10th grade "but has trouble reading and writing." In assessing his mental status, Dr. Powell observed that Plaintiff: (1) was oriented in time, place, and person, but probably not to situation; (2) was difficult to understand but his speech appeared relevant to the conversation; (3) "lacks full social graces" in his behavior; and (4) seemed to have "below average" intellect. Dr. Powell made *no attempt* to quantify what she meant by Plaintiff's intellect being "below average."

Dr. Powell's impression was that, at Axis I and II, Plaintiff suffered from "Possible Impulse Control Disorder" and "narcissistic and Explosive Personality Disorder"; at Axis IV, Plaintiff had "impairments in occupational functioning";[8] and, at Axis V, Plaintiff's GAF was "50 to 60."

The first requirement of Listing 12.05C is that the claimant must have a valid IQ of "70 or below." Unfortunately, *nothing* in Dr. Powell's report sheds any light on that crucially important issue.

**B.     Testimony Relevant to Plaintiff's IQ**

Plaintiff testified that his current address was "on the hill," living with his grandmother. He did not know the street address. When asked how long he had lived with his grandmother, Plaintiff responded "a long time." (Tr. 149.) When questioned about his age, the ALJ interrupted Plaintiff's responses and asked Plaintiff's grandmother, Ethel Brooks, to "step out, because he's [Plaintiff] relying too much on you and we need to hear what he has to say." Ms. Brooks left the hearing and questioning by Plaintiff's attorney resumed. (Tr. 150.)

Plaintiff did not recall the last grade he attended in school but did recall dropping out. (Tr. 150-151.) He stated he could read small words but not the newspaper. (Tr. 151.) He indicated he could count well enough to tell if a cashier gave him the correct change. He believed that he attended special education classes in school. (Tr. 152.) He has never had a driver's license or taken the driver's test. He does not drive. (Tr. 152.)

Plaintiff described his activities as watching TV all day. His interactions with other people are very limited: "I don't talk to nobody but my kin peoples." (Tr. 155.) According to Plaintiff, his

---

[8]Dr. Powell did not express an opinion on the extent of Plaintiff's "impairments in occupational functioning."

grandmother has to "remind me about everything . . . ." (Tr. 157.)

Interestingly, when Plaintiff's attorney asked him if he "could work some job eight hours a day, five days a week," Plaintiff responded: "Probably so" and seemed to indicate he was capable of working full time as a "janitor." (Tr. 154.) His attorney then asked him if he could work a forty-hour week as a janitor "cleaning up a school at night, you know, when the kids are gone and you're just doing some mopping, sweeping, . . . changing light bulbs, doing things like that." *Id.* Plaintiff answered as follows:

> A. Probably, most likely, if somebody's there, yeah.
>
> Q. If somebody what?
>
> A. If somebody's there.
>
> Q. Why would you need somebody else there?
>
> A. Just in case - - I got - - probably slack up or something, because I forget what I got to do.

(Tr. 154-155.)[9]

The ALJ allowed Ms. Brooks to reenter the hearing room to testify about her grandson. According to her, Plaintiff has lived with her since he was six years old. (Tr. 159.) She confirmed that, while Plaintiff was in school, he attended special education classes. (Tr. 160.) According to Ms. Brooks, she gave Plaintiff a bicycle when he was 18, but he rode it "into cars and stuff," so she took it away from him. (*Id.*) She confirmed that Plaintiff only interacts with his relatives and spends

---

[9]In context, Plaintiff's responses to these questions suggest that he might be able to work in some kind of "sheltered" employment. In the real world, however, close supervision of a janitor, to the point of reminding him of what he is supposed to be doing, simply does not exist. Social Security regulations draw a distinction between competitive and sheltered employment. *See* 20 C.F.R. § 404.1574. Moreover, the possibility of work in a sheltered setting is not substantial evidence supporting the denial of benefits. *See Gavin v. Heckler*, 811 F.2d 1195, 1198 (8th Cir. 1987).

most of his time watching TV. (Tr. 161.) She believed his withdrawal from other people stemmed from "when he was at school, I think the children would laugh at him a lot." (Tr. 162.) Finally, she indicated that she has to make sure Plaintiff "bathes himself good"; "he don't care about putting on his clothes right"; and "he don't care nothing about his grooming, how he looks." (*Id.*)

When asked what she believed prevented Plaintiff from working, Ms. Brooks responded: "I don't think he understands enough to do - really hold a job." (Tr. 163.)

**C.  Substantial Evidence Does Not Support The ALJ's Conclusory And Speculative Finding that Plaintiff "Has Borderline Intellectual Functioning"**

As previously explained, in order to satisfy Listing 12.05C, a claimant must have: (1) a valid verbal, performance, or full scale IQ of 70 or below; and (2) some other impairment which imposes a significant limitation on the claimant's ability to perform basic work. The Eighth Circuit has held that a physical or other mental impairment is sufficient to satisfy this second requirement if it has a "more than slight or minimal" effect on the claimant's ability to perform work. *See Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006).

In his decision, the ALJ explicitly found that the medical evidence established that Plaintiff suffered from "narcissistic and explosive personality disorder, which constitutes [a] severe impairment." (Tr. 18.) Thus, Plaintiff clearly appears to have met the second requirement of Listing 12.05C. This made it all the more important for the ALJ to fully explain the "substantial evidence" he relied on to support his finding that Plaintiff did *not* meet the first requirement of Listing 12.05C, *i.e.*, a valid IQ of 70 or below. (*Id.*) *See* DSM-IV at 740.

The ALJ noted in his decision that: (1) in January of 2002, a psychiatrist diagnosed Plaintiff with "mental retardation" based on his responses to verbal questions but without the benefit of an

IQ test; and (2) in August of 2004, Dr. Toombs administered an IQ test which reflected Plaintiff's IQ to be in the low 50's, but the score was invalid because Plaintiff did not put forth sufficient effort. However, the ALJ fails to mention that Dr. Toombs went on to find that, based on her questioning of Plaintiff, she believed his *valid IQ* was "well into the mid to high 60s." (Tr. 88.)  Thus, *both* of the experts who directly addressed the issue of Plaintiff's IQ concluded that it was *below 70*, a score indicating mild mental retardation, *not* "borderline intellectual functioning."

In an effort to support what appears to be his own independent determination that Plaintiff had "borderline intellectual functioning," the ALJ "notes that the record contains valid IQ scores from the claimant's childhood . . . [which] indicates that the claimant functions generally at a borderline-to-low-average level. (Ex. 1F, p. 10.)" Contrary to the impression created by the ALJ, the record does *not* contain any valid IQ scores from Plaintiff's childhood. What it does contain are "notes of a reviewing psychologist" which indicate that *he saw* results from a "WISC IQ test" administered on June 17, 1991, which reflected that Plaintiff had a verbal IQ of 70; a performance IQ of 85; and a full scale IQ of 76. (Tr. 102-103.) Even if the Court assumes that these IQ scores are valid, the IQ test would have been administered to Plaintiff when he was eleven years old. Pursuant to long-established Social Security regulations, "IQ test results obtained between 7 and 16 should be considered current for 4 years when the test is less than 40 and for 2 years when the test is 40 or above." 20 C.F.R. Pt. 404, Subpt. P App. 1, § 112.00(D)(10). Thus, it was plain error for the ALJ to rely on Plaintiff's IQ test scores from 1991 to support his findings, *made fifteen years later*, that "giving the claimant every benefit of doubt, . . . he has borderline intellectual

functioning."[10] (Tr. 15.)

Finally, the ALJ cites the psychological evaluation performed by Dr. Powell, on June 22, 2006, to support his finding that Plaintiff has an IQ of above 70. As explained previously, Dr. Powell neither administered an IQ test nor asked Plaintiff any questions which were directed at establishing a basis for estimating his IQ. In the "Mental Status" section of the evaluation, Dr. Powell *states only* that Plaintiff's "intellect seems below normal." (Tr. 112.) This generalized statement could mean anything from Plaintiff being "mildly mentally retarded" to Plaintiff having "borderline intellectual functioning." It clearly falls far short of the necessary substantial evidence needed to support the ALJ's determination that Plaintiff has "borderline intellectual functioning."

The Court also can find nothing in Plaintiff's testimony or the testimony of Plaintiff's grandmother that the ALJ could rely on to support his determination that Plaintiff has "borderline intellectual functioning." The ALJ found it significant that Plaintiff testified "he thought he could work an eight hour day, five days a week if he had close supervision . . . [performing] maintenance work." (Tr. 16.) What the ALJ fails to mention is that Plaintiff went on to explain that, in order for him to work full time as a janitor, he believed he would need someone there with him to remind him of what he was supposed to be doing. That kind of constant supervision amounts to a sheltered work environment, rather than the "close supervision" contemplated by full time jobs in the real world.

Finally, Plaintiff's subjective belief that he was capable of working full time as a janitor

---

[10]Ironically, when Plaintiff was eleven years old, the Social Security Administration determined that he *was disabled* and he received SSI benefits until he was eighteen years old. *See* Footnote 2, *supra,* at 2. The record in this case does not reveal the impairments that led to Plaintiff being determined to be disabled as a child. However, the record seems to suggest that determination was based, at least in part, on Plaintiff having been determined to be "mildly mentally retarded." This would seem to raise serious questions about the validity of the IQ scores the ALJ relied on from 1991.

raises an interesting paradox which the ALJ chose not to address: Why would a *mentally competent* claimant, with a pending application for disability benefits, testify that he believed he *was capable* of performing full time work as a janitor? According to the ALJ, "[t]he record indicates that the claimant [has borderline intellectual functioning] and has no desire to work," which presumably explained why he sought to be declared disabled. If the case was that simple, Plaintiff undoubtedly would have responded "No" when his attorney asked him if he was capable of performing a full time job as a janitor? Perhaps, Plaintiff's answer to that question revealed more about the true level of his intellectual functioning than the ALJ cared to address.

On remand, the ALJ should update the medical record and ensure that a qualified expert fully evaluates and determines, through proper testing, Plaintiff's IQ. *Plaintiff's counsel should carefully explain to Plaintiff the importance of his giving good effort and fully cooperating in the administration of this IQ test.* If Plaintiff were to again display "poor effort" in taking a WAIS-III IQ test, the Court might very well view the facts much differently in an appeal from another adverse decision by the ALJ.

### III. Conclusion

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 27th day of August, 2009.

_____
UNITED STATES MAGISTRATE JUDGE